FILED

2026 Feb-20  AM 10:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

Calvin B. Grigsby, Esq.
2406 Saddleback Drive
Danville CA 94506
(415) 860-6446
cgrigsby@grigsbying.com

Richard Rice Attorney and Counselor at Law
The Rice Firm, LLC
www.thericefirmllc.com
115 Richard Arrington Jr. Blvd. N.
Birmingham, AL 35203
Mailing Address - Post Office Box 453
Birmingham, AL 35201
205.618.8733 ext 101
rrice@rice-lawfirm.com

Johnathan F. Austin
Attorney at Law
115 Richard Arrington Jr. Blvd N.
Birmingham AL 35203
austin@jaustinlawpc.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

**CIVIL ACTION NO.:**

**WILLIAM MUHAMMAD AND BRENDA LEWIS**
*Plaintiffs*

**vs.**

**As To Count I:**

**Defendants  STATE SENATOR JABO WAGGONER, Individually, and in Official Capacity under color of State law, and  FORMER GOVERNOR ROBERT BENTLEY, Individually, and in Official Capacity under color of State law, SENATOR DAN ROBERTS, Individually, and in Official Capacity under color of State law, and GOVERNOR  KAY IVEY, Individually, and in Official Capacity under color of State law,**
**Sued for**

**Violation of Plaintiffs'  Constitutionally Protected**

1

**Fifth And Fourteenth Amendment Rights Prohibiting the State of Alabama From Seizing Board Seats of a Privately established  Public Benefit Corporation without Due Process of Law" Under 42 U.S.C. Section 1983.**

.

--------------------------------------------------------------------------------

**As To Count II:**

**Defendants  STATE SENATOR JABO WAGGONER, Individually; Former GOVERNOR ROBERT BENTLEY, individually; SENATOR DAN ROBERTS, individually; GOVERNOR KAY IVEY, individually; GOVERNOR KAY IVEY, Officially As Governor of The State of Alabama; LT. GOVERNOR WILL AINSWORTH, officially As Lieutenant Governor of The State of Alabama; JAMES A. (JIMMIE) STEPHENS, Officially As President of The Jefferson County Commission; Shelby County Commissioners KEVIN MORRIS, TOMMY EDWARDS,  JON PARKER,  WARD WILLIAMS, ELWYN BEARDEN, MIKE VEST, LINDSEY ALLISON, RICK SHEPHERD, AND  ROBBIE HAYES, Shelby County, a Governmental Entity; Blount County Commissioners , BRADLEY HARVEY, ALLEN ARMSTRONG, CHAD TRAMMELL, CHASE MOORE, AND NICK WASHBURN, Blount County a Governmental Entity,**

**Sued For**

**Violation of Plaintiffs' , Who Are Voters and Property Owners of the City of Birmingham, and Other Individual Voters and Property Owners of the City of Birmingham Who Are Similarly Situated,  U.S. Constitutionally Protected**
**Rights under the Fifth and Fourteenth Amendments Prohibiting unlawful Taking without Just Compensation of (1) the accreted Value of Their over 75 Years Investment in the Corporation providing water to their properties secured by their property right as electors for the governing body making Corporation Board appointments, (2)  the property right to hold the elected governing body for the City of Birmingham accountable to Plaintiffs and other similarly situated Individuals to assure the appointment of Corporation Board members who would protect and preserve the accrued value contributed to and invested in the Corporation by Plaintiffs for their benefit, and (3) the valuable mechanism for which Plaintiffs and other investor/ratepayers, beneficial owners, intended beneficiaries and stakeholders investment in the Corporation would be protected under the Corporation's Charter which guaranteed to Plaintiffs and other similarly situated investor/ratepayers, beneficial owners, intended beneficiaries and stakeholders the right to elect a governing body for the City of Birmingham that had the sole right to elect the five governing Board members with the sole authority to manage and operate the system built with Plaintiffs', and other similarly situated investors, contributed investment dollars, by Defendants, acting collectively, individually and in concert under Color of State Laws, without Due Process of Law Guaranteed by the 5th and 14th Amendments of the U. S. Constitution" Brought Under 42 U.S.C. Section 1983 against each individual for Economic Damages and Injunctive Relief.**

2

.......................................................................................................

**As To Count III**

SENATOR DAN ROBERTS, individually, and Governor  KAY IVEY, individually,  Governor KAY IVEY, Officially As Governor of The State of Alabama; Lt. Governor WILL AINSWORTH, officially As Lieutenant Governor of The State of Alabama; JAMES A. (JIMMIE) STEPHENS, Officially As President Of The Jefferson County Commission; Shelby County Commissioners KEVIN MORRIS, TOMMY EDWARDS,  JON PARKER,  WARD WILLIAMS, ELWYN BEARDEN, MIKE VEST, LINDSEY ALLISON,  RICK SHEPHERD, and  ROBBIE HAYES, Shelby County, a Governmental Entity; Blount County Commissioners , BRADLEY HARVEY, ALLEN ARMSTRONG, CHAD TRAMMELL,  CHASE MOORE, AND NICK WASHBURN, and Blount County a Governmental Entity;
sued for

Impairment of Contract Clause Art. I, § 10, cl. 1. Which provides in relevant part
"No State shall pass any  Law impairing the Obligation of Contracts"

This Count is brought by Plaintiffs, and the Class of similarly situated voters and property owners in the City of Birmingham who invested into the Corporation by paying all of the revenue bonds used to purchase the stock of the Birmingham Water Works Company which formerly owned the system and by paying all of the property taxes and user fees and electing the governing body that transferred at no cost or consideration the City of Birmingham owned  Industrial Water Board in 1993 and who are the intended beneficiaries  and stakeholders in the Corporation who have a derivative right, no different that shareholders of an investor owned water utility, to enforce the terms of the Corporations' Charter which is a contract with the State providing three founders with the right to organize the Corporation and establish the Articles or Charter that control how the Board of Directors are elected and the terms of offices that has been impaired by Defendants enforcement and implementation of two acts of the legislature leading to an actual amendment of the Corporation's Charter making a gift of the Board seats to persons and formal taking of the Corporations' assets on Jule 27, 2025.  The above defendants are sued for enforcing state laws or actions that were known and intended to deprives the Plaintiffs and the class of similarly situated individuals of their rights under the Charter to vote for a governing body that appointed a five member Board in Derogation of and which is a substantial impairment of Art. I, § 10, cl. 1. under 42 U.S.C. § 1983

.......................................................................................................

**As To Count IV**

DEFENDANTS:  Senator Dan Roberts, individually, and Governor  Kay Ivey, individually, Governor Kay Ivey, Officially As Governor of The State of Alabama; Lt. Governor Will Ainsworth, officially As Lieutenant Governor of The State of Alabama; James A. (Jimmie)

3

**Stephens, Officially As President Of The Jefferson County Commission; Shelby County Commissioners Kevin Morris, Tommy Edwards,  Jon Parker,  Ward Williams, Elwyn Bearden, Mike Vest, Lindsey Allison,  Rick Shepherd, and  Robbie Hayes, Shelby County, a Governmental Entity; Blount County Commissioners , Bradley Harvey, Allen Armstrong, Chad Trammell**

**(Violation of Equal Protection Clause,
14th Amendment, U.S. Constitution)
,**

**COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF**

-------------------------------------------------------------------------------------------------------------------------

**Count I**

**Defendants  STATE SENATOR JABO WAGGONER, Individually, and in Official Capacity under color of State law, and  FORMER GOVERNOR ROBERT BENTLEY, Individually, and in Official Capacity under color of State law, SENATOR DAN ROBERTS, Individually, and in Official Capacity under color of State law, and GOVERNOR  KAY IVEY, Individually, and in Official Capacity under color of State law,
Sued for**

**Violation of Plaintiffs'  Constitutionally Protected
Fifth And Fourteenth Amendment Rights Prohibiting the State of Alabama From Seizing Board Seats of a Privately established  Public Benefit Corporation without Due Process of Law" Under 42 U.S.C. Section 1983.**

**Introduction**

1.      Under Sections 394-402 of Title 37 of the Code of Alabama, as amended by Act 686 on September 19, 1949, three or more Birmingham individuals ("natural persons") may form and organize and incorporate a public benefit corporation to operate a water works plant and system "if it shall be made to appear to such governing body [of Birmingham ]that each of said persons is a duly qualified elector of and owner of property in said municipality, and if the governing body of said municipality shall adopt a resolution, which shall be duly entered upon the minutes of such

4

governing body, wherein it shall be declared that it is wise, expedient, and necessary that such a corporation be formed." The corporation commences its perpetual existence upon filing the governing articles of incorporation with the County Probate Court following the approving resolution. (See, Exhibit A, Act No. 686 ("Act 686")).

**The original 1950 Charter**

2.     On November 21, 1950, under Act 686,  The Water Works Board of the City of Birmingham was formed and organized with the Articles of Incorporation or Charter drafted and approved  by Incorporators J. Cooper Green, J. W. Morgan, and  C. E.  Armstrong being filed with the Probate Judge.  (Exhibit B, Original Corporate Articles). (The Water Works Board of the City of Birmingham is referred to hereinafter as the "Corporation.") (The Original Corporate Articles as amended is referred to as the "Charter").

3.     Under Act 686 these incorporators established and founded the Corporation with a perpetual existence, and with the objects for which the corporation is organized and the number and term of office and procedure for appointment of Board members as determined by the three incorporators set forth in the Charter.

4.     The only role of the City Birmingham is to authorize the incorporation, approve any amendment of the articles of  incorporation once resolution to amend is approved by the water board, and be transferred  the properties of the water works when all of the bonds of the water works are repaid.

5.     Pursuant to Title 37 Section 397, the first Board Members, which were to be elected by the City Commission were (1) Merrill Pratt (2 year term), C. van den Berg (4 year term) and ( 3)  Alex C. Montgomery (6 year term).  Under section 397 the City Commission had

the right to appoint replacement directors. City does not have the right to appoint board members under State law.

6.    The Charter of the Corporation did not provide term limits on reappointments of Board Members.

7.    The provisions in the Charter provided that the first two objectives of the Corporation were:

> l. To acquire and operate the water works, plants, properties, system and assets owned by the Birmingham Water Works Company hereinafter called Water Company, and used or held for use by it
> in the service of the public in the City of Birmingham and adjacent territory in Jefferson County, Alabama; to enlarge, extend and maintain said system and to acquire all rights, properties and assets deemed in furtherance of such operation.
> 2. To acquire said system and properties either by direct purchase from the Water Company or by providing for the purchase of the common stock of the Water Company from the holders thereof to be accompanied or followed by the liquidation or dissolution of
> the Water Company and vesting of its Water works system and assets in the Corporation hereby organized. (Exh. B)

### The 1951 Purchase by the Corporation of all the outstanding stock of the Investor owned Water Company.

8.    On July 9, 1951 all of the outstanding shares of stock of the Water Company were acquired, the Water Company assets and employees were transferred to the Corporation, the Water Company was dissolved, and the Corporation continued the independent public-utility potable water treatment and delivery business of the independent Water Company it acquired. (Exhibit C)

9.    The purchase price of the shares of the Water Company was privately financed the Corporation's debt repaid by the residents and businesses who were users and subscribers to water services of the Corporation by the pledge of their user fees coupled with a rate covenant to

adjust user fee rates sufficiently to amortize revenue bonds, the proceeds of which purchased the shares of the Water Company.

10.     The Corporation has never received financing from the State of Alabama or the City of Birmingham and very early on in  *Coxe v. Water Works Bd.*, 288 Ala. 332, 337, 261 So. 2d 12, 15-16 (1972) the Alabama Supreme Court ruled the Corporation was not a political subdivision or arm of the State even though its Board members were approved by the Birmingham governing body:

> "Appellant contends that the Water Works Board, as a public corporation, is an arm of the City of Birmingham and a subdivision of the State, *** title 37, §§ 394-402(1), Code of Alabama 1940, provides for the creation of Water Works and Sewer Boards. Under this statute, a public corporation is created for the purpose of operating a water works plant and system. The parties agree the Board was organized under this statute. Such public corporation is given broad powers, including the power to dispose of its property, borrow money, mortgage its property, and pledge revenues. It would seem that one of the objectives in the creation of such a public corporation is to establish an entity separate from the city whose financial obligations would not become burdens on the city's fiscal resources.
>
> In Taxpayers & Citizens, etc. v. Board of Water & S. Com'rs of City of Mobile, 261 Ala. 110, 73 So.2d 97 (1954), there was a question raised as to the constitutionality of the Mobile Water Works Board's pledging its water revenues as security for bonds issued by the Board. This court specifically held that the Water Works Board was not subject to the constitutional limitations of § 94* * * "Moreover, in *Opinion of the Justices*, 254 Ala. 506, 49 So.2d 175 (1950), the justices were of the opinion that various public corporations, including water works boards were not subdivisions of either state, city or county, and there said:
>
> "It is well established by the decisions of this court that a public corporation is a separate entity from the state and from any local political subdivision, including a city or county, within which it is organized. "

### All of the Corporation's Assets and Operating Cost are paid for by the beneficiaries of the Corporation's water services—who are the Corporation's Beneficial Owners and Stakeholders

11.     Under State Law, the Corporation and its ability to finance its water works and system is governed strictly by its Charter and is completely independent from the City and surrounding areas its serves and elected officials have no right to impair or interfere with the

Boards exercise of its rights as articulated in the Charter established by the original individual incorporators. This principle has been stated many times by the Alabama Supreme court. In the case of *Water Works Bd. v. City of Arab*, 231 So. 3d 265, 271 (Ala. 2016) for example, the Supreme Court states:

> "…the Legislature intended public-utility corporations to be independent of the municipalities they serve:
>
> "'In order to make it possible for municipalities to finance utility systems without being blocked by the limitations contained in the Constitution of 1901 (particularly Sections 222 and 225 relating to the creation of debt by municipalities), a number of statutes permitting municipalities to issue revenue bonds were enacted in the early 1930's, varying in detail, but in general making such bonds payable out of the revenues of the utility to be constructed, expanded or improved with the proceeds of such bonds. The opinions of the Justices of the Supreme Court of Alabama on the constitutionality of such statutes were sought in several instances,
> "'A considerable body of law developed from the State's experimentation with the power of a municipality to issue its revenue bonds and to use the proceeds thereof to construct or improve a utility which it owned. Although such body of law did in a great number of instances permit desired financing arrangements, the issuance of revenue bonds by a municipality itself was, nevertheless, circumscribed by a fairly elaborate set of rules which could not always accommodate reasonable projects.
>
> "'The ultimate solution to the complexity of financing municipal utility systems was achieved by legislation permitting the establishment of independent public corporations to own and operate the utility systems for the municipalities to be served by such system. Such public corporations derived their immense usefulness in this respect from their legal status as special political entities created by the Legislature which, so long as they maintained their corporate separation from the municipalities they served, were not subject to the constitutional limitations on such municipalities.'"(internal citations deleted)

12.    Because of this complete financial separation from the City of Birmingham and the State of Alabama, the successors in interest to the initial incorporators and beneficiaries of the water works who were voters and property owners of the approving municipality—Birmingham --"foot the bill" i.e. paid for all of the infrastructure and capital facilities costs of the Corporation as well as operations and maintenance costs through the investment of their fee and rate charges paid to the Corporation which were managed by a 5 person Board of Directors

appointed by the Birmingham City Council who were elected by these successor in interest voters and property owners.

13.    So not only did the voters and property owners of Birmingham pay for the water works owned by the Corporation, but they also exercised ultimate control over the Corporation's management by their right to elect City Councilors who were thereby accountable in their Corporate Board member selection to the voters and property owners and investor /ratepayers.

14.    This symbiotic relationship was protected by the Charter which guaranteed the voters and property owners who financed the system the right to select Council representatives who could appoint the 5 Board members whose policies protected their financial investment in the Corporation.

15.    Neither the City not the State of Alabama had the rights to change this established relationship as set out in the Charter.

16.    Under the Corporation's Charter only the Board  by Resolution may make amendments to modify the number and term of the Board members

17.    The Alabama Supreme Court has on a number of occasions has made it clear that the any change in the Corporation Charter, number of Corporation Board Members, their staggered terms, and any procedures for their selection contained in the Corporation Charter may be initiated only with a resolution of the existing Board of Directors in order to keep the Board from being seized by political influence that could impact the contract contained in the Charter with revenue bondholders, and other stakeholders and beneficiaries of the Water Works system the least of which were the Investor/ratepayers who paid the revenues used to amortize the revenue bonds.  In  *Water Works Bd. v. Huffstutler*, 292 Ala. 669, 681, 299 So. 2d 268, 276, 279 (1974). for example the Alabama Supreme Court stated:

"…the respondents argue that the governing body of the City has an absolute right to increase the number of directors of the Board without the necessity of first having a conflicting provision of the Board's Charter amended through use of the general amendatory procedure provided in the Water Board Statute. In effect, this argument asserts that, with respect to increasing the number of directors, the Legislature has created a special right in the City which must be recognized despite its inconsistency with the remainder of the Water Board Statute. The special right can be used to seize control of a water board organized under that Statute in violation of its corporate charter. To sustain this argument, the respondents must show that the Legislature intended to depart radically from the general structure of statutory and case law which has heretofore preserved the corporate integrity of water boards organized under the Water Board Statute.\*\*\* It was obviously the policy of the Legislature to protect such boards, which have responsibilities both to bondholders and to users of their water systems, from the political shifts and machinations which often take place on the heels of a change in city government. …(Section 397 of Title 37, as amended).\*\*\* *there can be no doubt that such changes, whether they involve the eligibility of municipal officials to serve as directors or an increase in the number of directors, can only be made pursuant to the amendatory procedures of Section 395 or Section 402(16)*. (Emphasis added)

18.     The amendments of the Charter to supply water to communities outside Birmingham and Jefferson County as authorized in the original Charter was a purely voluntary decision by the Corporation Board and all the requests were purely voluntary inasmuch as every property owner in the State of Alabama is authorized, subject to minimal regulations regarding drilling, to own and operate his or her or its own water well.

19.     There is no State law requiring the Corporation to supply or any individual property owner to take water from the Corporation.

20.     Moreover, every County and City outside of Birmingham has the legal right to have water and other public utility services supplied by their own public utility established by one or more municipalities for their residents (e.g. Ala. Code § 11-50-390 et seq.) or by mutual economic benefit corporations established by individuals, or by public benefit water corporations established by three individual electors and property owners, as in this case, or by individuals establishing non-profit water suppliers, by individuals establishing investor owned, for profit

public water utilities as was the Water Company.  Each form of ownership of potable water suppliers, including individually owned water wells and nonprofits, are authorized under State law.  Only those water companies formed by political subdivisions as in §11-50-390 are arms of the State subject to Board reorganization by the State in violation of the corporate Charter.

21.    The Boards of public utilities established by municipalities or the State government, may be changed or modified at will by State legislation because they are creatures of the government (*Newton v. Se. Ala. Gas Dist, infra* and *City of New Orleans v. New Orleans Water-Works Co.*, 142 U.S. 79 (1891)) whereas the perpetual Boards of public utilities and institutions established by natural persons are protected from state takeover or political interference, maintaining their autonomy under the Contract Clause (Article I, Section 10) of the U.S. Constitution, which prohibits states from impairing the obligation of contracts.  (*Trustees of Dartmouth College v. Woodward*, 17 U.S. 518 (1819).

22.    The *Dartmouth College* decision upheld the principle that private, public benefit, non-profit, or other business entities established by individuals have the right to manage their own affairs without arbitrary state interference. It solidified the concept of private public benefit or charitable organizations and influenced the development of corporate personhood and constitutional protection for business.

23.    Following this Water Company acquisition, the Charter of the Corporation was amended several times by a resolution of the Corporation Board, and thereafter approved by the City of Birmingham Commission, to meet the requests to supply water to users from adjoining counties outside of Birmingham and Jefferson County and to purchase the assets of the City of Birmingham Industrial Water Board, leading ultimately to a single "clean-up" amendment that incorporated all these prior amendments and adopted new provisions authorizing a 5 seat Board

with staggered terms.  (See Exhibit D- Certificate of Amendment and Restatement of Certificate of Incorporation of the Water Works And Sewer Board of the City of Birmingham (June 15, 1999))

24.     The June 15, 1999 amendment to the Charter (the "Amended Charter") was authorized under Alabama Code §11-50-230 et seq. clearly provides the objective of the Corporation is service to the public, to wit:  "To construct, establish, purchase, extend, combine, operate, manage and maintain a domestic and industrial water system and sewer system, or systems, for the service of the public…"

25.     Section 6.02 of the Amended Charter provides that:

"The directors of the board shall be elected by the governing body of the City and shall consist of five members. Any officer of the City shall, as provided by law, be eligible for appointment and may serve as a member of the board of directors. The directors of the Board shall hold office for staggered terms."

26.     Section 6.06 of the Amended Charter provides that:

" Directors whose terms shall expire shall nevertheless serve until the election of their respective successors."

27.     Plaintiffs William Muhammad and (Brenda Lewis, formerly Brenda Dickerson) are two of five former Board members appointed by the governing body of the City of Birmingham who in 2015-2016 were directors when Defendant Jabo Waggoner, among others, sponsored legislation, which was signed and implemented by Defendant Former Governor Robert Bentley, (1) to reduce the Corporation's directors to be appointed by the governing body from 5, which included Plaintiffs, to 3 thereby diluting the appointment power of the governing body under the Charter from 100% to 33.3%,  and (2) to increase the number of board members from five appointed by the City of Birmingham governing body  to nine with three appointed by the City Mayor and one appointed by the Mayor's association and one each appointed by Shelby

12

and Blount counties.  This was a stark and arbitrary deprivation of Plaintiffs Board director's rights, as having two-thirds of the Corporations 5-member Board voting power, by defendants Waggoner and Bentley acting under color of state laws 2016-276/7 and 2015-164.

28.    Plaintiffs continued to be members of the Corporation Board under state laws 2016-276/7 and 2015-164 because any change in the Board would first require a resolution of the Board.  There was no resolution of the Board purporting to amend 6.02 and 6.06 of the Charter to replace Plaintiffs appointed by the governing body of the City of Birmingham  which states "[T]he directors of the board shall be elected by the governing body of the City and shall consist of five members" until   June 27, 2025 and eliminate the Charter provision that all directors term is extended until a successor is appointed in 6.06  until   June 27, 2025.  (Exhibit E)

29.    The language of the purported Board resolution of June 27, 2025 is an admission that there were five directors appointed by the City governing body at least until June 27, 2025, which purported resolution of June 27, 2025 this lawsuit alleges was an unconstitutional resolution. (The "Unlawful June 2025 Resolution")

30.    The  Unlawful June 2025 Resolution causes the Corporation  public benefit corporation to altered and abandon its original mission authorized by State law Ala. Code 11-50-230 et seq. was a non-risible

31.    "takeover" of a public benefit nonprofit, non-investor owned water utility by government officials, involving threats and forced removal of board members, and was clearly a "gross usurpation of power" and unlawful.

32.    This takeover eliminated two of five board seats appointed by the City of Birmingham governing body on July 27, 2025 without any possible lawful, necessary, and reasonable exercise of police power to protect public safety.

33.     Because Article III confers federal court jurisdiction only on cases or controversies, this federal court clearly  subject matter jurisdiction over this Count I to the complaint.

34.     First, the Plaintiffs have suffered an 'injury in fact'—because they have a legally protected interest in not being taken out of their board seats for pretextual reasons which are concrete and particularized, because to elimination of the Charter provision in Section 6.02 affect the Plaintiffs who were appointed by the governing body of the City personally and individually way." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548, 194 L. Ed. 2d 635 (2016) (quoting *Lujan*, 504 U.S. at 560 n.1). "The Plaintiffs injury is concrete because there is no question of fact that prior to the first Board change they had been selected by the City's governing body and the purported amendment of the Charter to eliminate the Governing body's section 6.02 appointment power did not occur until June 27, 2025.

35.      Second, "the injury is  'fairly . . . trace[able] to the stark and arbitrary  resolution to change the Board from 5 to 9 members and change the terms of and appointer powers relating to Board members in 2015-2016 following an amendment of the state laws put into place by Defendants Waggoner and Bentley which was not implemented by a change in the Charter until June 27, 2025 based on legislation in Act 25-297 sponsored and signed and implemented by Defendants Senator Dan Roberts and Governor Kay Ivey, respectively.

36.     Under State law a public benefit Corporation must act in accordance with the authority set forth in the Corporation  Charter, which was not amended from 1999 through June 27, 2025 did not abolish Plaintiffs board seats appointed by the governing body until the Unlawful June 2025 Resolution.

37.    Because there was no amendment in the Charter until the Unlawful June 2025 Resolution which amendment  both deprived Plaintiffs, and each of them, of a right to an existing Corporation Board membership which is an intangible, contractual, or membership-based property right that cannot be taken away arbitrarily, but rather requires strict adherence to the Corporation's Charter, and, in many cases, fundamental principles of due process and was "not the result [of] the independent action of some third party not before the court.'" *Lujan*, 504 U.S. at 560-61 (quoting S*imon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 41-42, 96 S. Ct. 1917, 48 L. Ed. 2d 450 (1976)).

38.    Third, "the deprivation must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable  decision.'" Id. at 561 (quoting *Simon,* 426 U.S. at 38, 43). A determination by the Court that the Unlawful June 2025 Resolution was unconstitutional reinstates the 1999 Amended and restated Articles where the Plaintiffs were still directors of the Corporation.  The salient inquiry regarding redressability is whether "the effect of the court's judgment on the defendant—not an absent third party— . . . redress[es] the plaintiff's injury, whether directly or indirectly." *Lewis v. Governor of Alabama*, 944 F.3d 1287, 1301 (11th Cir. 2019).

39.    There are no provisions in the legally approved Charter back in 1999 before the pretextual "takeover" by the State in deprivation of Plaintiffs 5th Amendment rights enforced under the 14th Amendment and 42 USC §1983 that allow for Plaintiffs,  Board Members, to be removed or asked to resign or have their voting power reduced or compromised.  There are no provisions in the Charter that allow for the Charter to be amended to increase Board membership from five to nine members and then to have that invalidity changed to 7 members, without even having a resolution implementing modifications of the Charter for the 9 member board. Now the

governing body that had 100% of the appointment power only has 14% of the appointment power because the City's governing body now has only one appointment under a completely new statute other than  § Section 11-50-230, which has been on the books since 1975 and under which numerous individuals forming and organizing waterworks have relied (see Exhibit F).  To be sure the redressability is a straight spade royal flush because the basis for the change from  § 11-50-230, to the new § 11-50-300 is based not on speculation but on an impossibility that there could be another water works which "after January 1, 2015, either serves water customers or has assets in four or more counties other than the county where the authorizing municipality is located" which based on the map of the State of Alabama attached as Exhibit G is geographically impossible.

40.     There are no provisions in the Charter that allow for three or any number of Board members to be appointed by the Mayor, representatives of Shelby County, or representatives of Blount County. Clearly a Charter of an individually formed public benefit water supplier cannot be amended absent some dire public safety reason. The parties are litigating whether the State Governor may terminate all the members of Public benefit water companies incorporated by natural persons for the benefit of a specific municipality that are not political subdivisions or an agent of the municipality.   A  public benefit corporation like the Corporation, formed by individual electors and property owners, and funded solely by the fees paid for services by private individuals and companies users, is not a municipality or the alter ego or agent of the county or the municipality in which it is organized. Id." *Dobbs v. Shelby Cnty. Econ. & Indus. Dev. Auth.*, 749 So. 2d 425, 430 (Ala. 1999); see also *Health Care Auth. for Baptist Health v. Davis*, 158 So. 3d 397, 402 (Ala.  [*847]  2013) (noting that a public corporation "is an entity separate from the State and from the persons and entities who participated in its creation");

16

*Alabama Hosp. Ass'n v. Dillard*, 388 So. 2d 903, 905 (Ala. 1980) (quoting Opinion of the Justices No. 120, 254 Ala. 506, 511, 49 So. 2d 175, 180 (1950)) ("We simply hold, as we have so often, 'that a public corporation is a separate entity from the state and from any local political subdivision, including a city or county within which it is organized.' "); *George A. Fuller Co., v. Vulcan Materials Co.*, Se. Div., 293 Ala. 199, 202, 301 So. 2d 74, 76 (1974). This separate-entity doctrine has long been applied for the purpose of exempting public corporations from certain constitutional and statutory prohibitions applicable to the state, counties, and municipalities See, e.g., *Limestone Cnty. Water & Sewer Auth. v. City of Athens*, 896 So. 2d 531 (Ala. Civ. App. 2004) (holding that water-works authority was a separate entity and thus was not subject to reimbursement requirements of § 22-25-16, Ala. Code 1975, applicable to "the State of Alabama, any county, municipality, or [a] municipal utility board"); *Dillard*, 388 So. 2d at 905-06 (holding that public-hospital corporations were separate entities from the State and, therefore, not bound by §§ 68 and 94 of the Alabama Constitution of 1901); *Knight v. West Alabama Env't Improvement Auth.*, 287 Ala. 15, 21, 246 So. 2d 903, 907 (1971) (concluding that public corporations are not subject to constitutional restriction on local governments borrowing because they are "[s]eparate, independent public corporations .... They are not subdivisions of the State within the meaning of Section 94 of the Constitution...."); *Opinion of the Justices No*. 169, 270 Ala. 147, 148, 116 So. 2d 588, 589-90 (1959) ("It has been repeatedly held that a public corporation is an entity separate and distinct from the State, and that debts of such corporation are not the debts of the State, within the purview of Section 213[, Ala. Const. 1901]."); Opinion of the Justices No. 120, 254 Ala. at 512-13, 49 So. 2d at 181-82 (holding that act that permitted bonds to be issued by public corporations organized by municipal governments did not violate constitutional provision restricting the State or local governments from incurring debt, lending

credit, or issuing bonds when such public corporations were separate entities from the State or local government). Furthermore, the individuality of corporate entities, including public corporate entities, was well established at the time the predecessor to § 6-10-10 was originally enacted in 1886. See, e.g., F*itzpatrick v. Dispatch Publ'g Co.*, 83 Ala. 604, 606, 2 So. 727, 728-29 (1887); *Paschall v. Whitsett, 11 Ala. 472 (1847)*; and John F. Dillon, Commentaries on the Law of Municipal Corporations § 18 (3d ed. 1881). *WM Mobile Bay Envtl. Ctr. v. City of Mobile Solid Waste Auth.*, 355 So. 3d 841, 846-47 (Ala. 2021)

**Class Allegations (Board Members Appointed Pursuant to the 1999 Charter)**

41.    Plaintiffs bring this claim pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all individuals who have served, are serving, or will serve as members of the Board of the water utility system appointed pursuant to the 1999 Charter.

42.    The class is so numerous that joinder of all members is impracticable. The members of the class are readily ascertainable from official appointment records and municipal documents reflecting appointments made under the 1999 Charter.

43.    There are questions of law and fact common to the class, including but not limited to whether the actions challenged herein violate constitutional protections afforded to duly appointed Board members; whether the structure and enforcement of the 1999 Charter create constitutionally protected interests; whether Defendants, acting under color of state law, deprived class members of rights secured by the Constitution; and whether declaratory and injunctive relief is warranted.

18

44.     Plaintiffs' claims are typical of the claims of the class because they arise from the same course of conduct by Defendants and are based on the same legal theories. Each class member's claim arises from the same governing Charter provisions and the same allegedly unlawful actions affecting the authority, tenure, or constitutional protections of Board members.

45.     Plaintiffs will fairly and adequately protect the interests of the class. Plaintiffs have no interests antagonistic to those of the class and have retained counsel experienced in complex litigation and federal constitutional claims.

46.     Defendants have acted or refused to act on grounds generally applicable to the class, making final injunctive and declaratory relief appropriate with respect to the class as a whole under Rule 23(b)(2).

47.     To the extent damages or individualized relief are implicated, common questions predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy under Rule 23(b)(3).

## Count II.

**Defendants  STATE SENATOR JABO WAGGONER, Individually; Former GOVERNOR ROBERT BENTLEY, individually; SENATOR DAN ROBERTS, individually; GOVERNOR KAY IVEY, individually; GOVERNOR KAY IVEY, Officially As Governor of The State of Alabama; LT. GOVERNOR WILL AINSWORTH, officially As Lieutenant Governor of The State of Alabama; JAMES A. (JIMMIE) STEPHENS, Officially As President of The Jefferson County Commission; Shelby County Commissioners KEVIN MORRIS, TOMMY EDWARDS,  JON PARKER,  WARD WILLIAMS, ELWYN BEARDEN, MIKE VEST, LINDSEY ALLISON, RICK SHEPHERD, AND  ROBBIE HAYES, Shelby County, a Governmental Entity; Blount County Commissioners , BRADLEY HARVEY, ALLEN ARMSTRONG, CHAD TRAMMELL, CHASE MOORE, AND NICK WASHBURN, Blount County a Governmental Entity, Sued For**

**Violation of Plaintiffs' , Who Are Voters and Property Owners of the City of Birmingham, and Other Individual Voters and Property Owners of the City of Birmingham Who Are Similarly Situated,  U.S. Constitutionally Protected**

19

**Rights under the Fifth and Fourteenth Amendments Prohibiting unlawful Taking without Just Compensation of (1) the accreted Value of Their over 75 Years Investment in the Corporation providing water to their properties secured by their property right as electors for the governing body making Corporation Board appointments, (2) the property right to hold the elected governing body for the City of Birmingham accountable to Plaintiffs and other similarly situated Individuals to assure the appointment of Corporation Board members who would protect and preserve the accrued value contributed to and invested in the Corporation by Plaintiffs for their benefit, and (3) the valuable mechanism for which Plaintiffs and other investor/ratepayers, beneficial owners, intended beneficiaries and stakeholders investment in the Corporation would be protected under the Corporation's Charter which guaranteed to Plaintiffs and other similarly situated investor/ratepayers, beneficial owners, intended beneficiaries and stakeholders the right to elect a governing body for the City of Birmingham that had the sole right to elect the five governing Board members with the sole authority to manage and operate the system built with Plaintiffs', and other similarly situated investors, contributed investment dollars, by Defendants, acting collectively, individually and in concert under Color of State Laws, without Due Process of Law Guaranteed by the 5th and 14th Amendments of the U. S. Constitution" Brought Under 42 U.S.C. Section 1983 against each individual for Economic Damages and Injunctive Relief.**

48.     Plaintiffs, and those other individuals voters and property owners that are similarly situated, as individual investors seek "just compensation" from the defendants, individuals and officials at the State of Alabama, Jefferson County, Shelby County and Blount County who under color of State law have seized from the control of Birmingham voters and property owners and Investor/ratepayers their property rights embodied in the Charter to elect the governing body who appoint a 5 member Board of City of Birmingham residents charged with protecting a 75 year investment in the Corporation's assets and management by these voters and property owners and Investor/ratepayers.

49.     Under the Plaintiffs, and those similarly situated Charter rights, 100% of the Board members were appointed by a governing body under their control who represented their interests. This was a very valuable property right similar to a voting agreement among shareholders in a stock corporation that allows a certain class of stockholders to elect all of the directors in a corporation even though other classes still receive dividends and profits of the corporation.

20

50.     In the Charter as amended in 1999, the Plaintiffs as voters, property owners and Investor/ratepayers, had 100% control of the governing body who were Plaintiffs voters, property owners and Investor/ratepayers representatives that appointed all 5 of the directors of the corporation who controlled the assets of the Corporation and were responsible for protecting their investment.

51.     Acting under color of state law the defendants state senator Jabo Waggoner, individually; former governor Robert Bentley, individually; senator Dan Roberts, individually; governor  Kay Ivey, individually; governor Kay Ivey, officially as governor of the state of Alabama; lt. governor Will Ainsworth, officially as lieutenant governor of the state of Alabama; James A. (Jimmie) Stephens, officially as president of the Jefferson county commission; Shelby county commissioners Kevin Morris, Tommy Edwards,  Jon Parker, Ward Williams, Elwyn Bearden, Mike Vest, Lindsey Allison,  Rick Shepherd, and  Robbie Hayes, Shelby county, a governmental entity; Blount county commissioners , Bradley Harvey, Allen Armstrong, Chad Trammell, Chase Moore, and Nick Washburn, Blount county a governmental entity first reduced this 100% control of the Corporation's assets and equity to 3/9$^{ths}$ of 33% control by the governing body city council in Act 215-164 and then amended that law to reduce the control of Plaintiffs representatives on the City council had elect Board members to 6/7 or 14%.

52.     This seizure by the above defendants acting in concert of equity control of Plaintiffs class through the loss of Board appointment power is the loss of a very valuable property right under color of law without just compensation.  As the Eleventh Circuit state in a less egregious taking in *Braun v. Am.-CV Station Grp., Inc. (In re Am.-CV Station Grp., Inc.)*, 56 F.4th 1302, 1309 (11th Cir. 2023)

> As we see it, the original plans gave the Pegaso Equity Holders the exclusive opportunity to obtain 65.8% of the equity interests in the reorganized holding companies. The sole purpose of the modification was to strip them of this equity. The modification therefore "materially and adversely" changed the way the Pegaso Equity Holders were treated under the plans, entitling them to a new disclosure statement and a second chance to cast a ballot.
> Braun v. Am.-CV Station Grp., Inc. (In re Am.-CV Station Grp., Inc.), 56 F.4th 1302, 1309 (11th Cir. 2023)

53.     86% of the Board control of the Corporation having approximately $1.88 billion in book value taken in a legislative corporate raid without payment of just compensation to the original beneficial owners and stakeholders and founders, who are voters, property owners and Investor/ratepayers of the City of Birmingham whose dollars built the company and whose representatives have the power to control 100% of the 5 Board seats prior to the State of Alabama's confiscation of their property and property rights without due process and without just compensation implemented by defendants under color of state laws violates the 5th and 14th Amendment rights of the Plaintiffs under  U.S. Constitution.

54.     Only in Communist Countries like Cuba and China are governmental officials allowed to legally perpetuate the firing of the Board members and the confiscation of privately incorporated and funded and managed Corporate assets previously controlled by the fired Board members for the so-called benefit of the public good or the benefit of the state, without compensation equal to the fair market value of the property and property rights taken.

55.     Governor Ivey, Lt Gov Ainsworth and the Commissioners of Shelby and Blount Counties have contributed less than 1% if the money required to pay the debt that was used to acquire the Corporation's water works and now these two individual and two County governing bodies under color of State laws control 57% of the Corporation for zero cost or payments to Plaintiffs.

56.     No hearing or other due process has been instituted to explain and take evidence on what public need is being addressed by the taking and why the State did not use less drastic regulatory power rather than a wholesale firing of the Board designated by the City approving the incorporation of the water works.  What is the public safety or public heath exigency for the takeover? Failure to have a hearing to address the reasons for the takeover and allow the victims of the takeover to present evidence in their defense violates the 5th and 14 Amendment due process clauses.

57.    The takeover by the State Governor and her political supports appears to be just a political takeover for the political benefit of the Governor Ivey, Lt. Governor Ainsworth, Jimmie Stephens and a laundry list of their political supporters who now under color of state law and/or guise of "public police power" of State law get control of all the valuable assets paid for over the last 75 years by Plaintiffs, and those other individuals similarly situated,.

58.    The 86% of the assets and property taken must be repaid to the Plaintiffs I the amount of approximately $1.6 billion.

59.    Ever corporation must be formed by the State's approval.  Every corporation must elect Board members in accordance with its Charter.  It the State can take over the charter of any public water utility it choses, just by writing legislation that applies only to that single corporation but state (with a wink) that it may apply in the future to an unknown corporation, then all corporate entities in Alabama can be placed under control of the governor and her political allies and no private corporately owned property is safe from state confiscation.

60.    A individually formed public benefit water company cannot be seized and taken by state officials by passage of laws which neuter  the Charter governing the appointment of Board members

61.     Because there are no shareholders, the Board members are equivalent to defacto owners the company and the persons who appoint the Board members become the defacto shareholders and beneficiaries.   At the time of the seizure and taking of the Corporation, by changing the Charter on June 27, 2025, the value of the Corporation transferred by the State under color of state laws by Defendant State and County Officials, all of which represent de facto beneficiaries who live outside of the City of Birmingham gained six-sevenths of  $1.89 Billion dollars of appraised value worth $1.6 billion dollars plus interest to reflect the time value of money.

62. The 5th amendment provides in material part that "No person shall be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

63. Plaintiffs, as individual investors in the debt of the Corporation and beneficiaries of its assets and other similarly situated investors in and beneficiaries of the Corporation have accumulated to the date of the amendment of the Charter on June 27, 2025 to modify the Board and the persons or entities who appoint the Board, under the 5th Amendment must be paid by those Defendants who appoint the Board members just compensation for the $1.6 billion dollars.

64. The payment of "just compensation" must then be transferred to Plaintiffs and other similarly situated individuals who are voters and property owners of the City of Birmingham who control the Board seats in accordance with the records obtained from the Corporation to show the amount of aggregate payments since being connected Corporation's water works.

65. Legislation must be passed to allow the issuance of revenue bonds backed by charges assed against the newly legislated defacto owners of the right to appoint 6/7ths of the Board members who by the confiscatory Charter amendment of June 27,2025 stole the assets illegally in violation of 5th amendment due process right under the guise of a public necessity (which there was not).

66. Plaintiffs, and those individual investors in the Corporation for the past 75 years which are similarly situated, must receive the full equivalent of the following property rights:

    a. the accreted Value of Plaintiffs and other similarly situated investors 75 Years Investment in the Corporation's debt payments and maintenance costs providing water to their properties,

b.  the value of the property right to have the elected governing body for the City of Birmingham, who are Plaintiffs and other similarly situated investors representatives that they vote to put in office, accountable to Plaintiffs and other similarly situated Individuals which increases the likelihood of the appointment Corporation Board members who would protect and preserve the accrued value contributed to and invested in the Corporation by Plaintiffs , and

c.  the value of the  mechanism by which Plaintiffs and other beneficiaries investment in the Corporation's assets and operating costs would be protected under the Corporation's Charter which guaranteed to Plaintiffs and other similarly situated investors the right to elect a governing body for the City of Birmingham that had the sole right to elect the five governing Board members with the sole authority to manage and operate the water company.

67.    Government seizure of contractual rights, unlike real property, constitutes a compensable "taking" under the Fifth and Fourteenth Amendments if it destroys the contract's value.

68.    Plaintiffs have had taken without just compensation the  valid, vested property/contract rights in a, b, and c of par. 67 above by  direct governmental laws and actions of the individuals who have appointed the new board members with full knowledge that Board memberships of privately organized public water utilities are paid for by the investments of the users that repay and amortize the revenue bonds that purchase all the Corporations' assets now equal to S1.88 billion dollars.

69.    The just compensation to repay that investment must be made back to the electors of the governing body who pay all the debt used to acquire the $1.8 billion in Corporation assets are per the Charter the principal beneficiaries of the Corporate purpose for formation.

70.    The voters and property owners of the City of Birmingham's right to enforce the Charter as beneficiaries of the Corporation's purposes and rights as primary Corporation investors are contract rights agreed to by the State of Alabama in Ala Code 11-50-230 et seq, as it may be amended, and is therefore vested and valid, just as other intangible interests such as patents, trademarks and contracts are protected property whose rights cannot be impaired under the U.S. Constitution.

71.    The State of Alabama Governor's, Senators, and County Commissioners appointing Board members outside the primary area for which the corporation was formed to serve with Board members directly accountable to the voters and property owners who have invested no dollars in the Corporation is an illegal and confiscatory taking without due process and just compensation.

72.    The accumulated asset values built up by Plaintiffs over the last 75 years with their payments of debt service, are being taken by governing bodies of the State and Shelby and Blount Counties for free, under color of state law by defendants,  and these governing bodies with use the assets to benefit their constituencies to the detriment of Plaintiffs' investments.

73.    The confiscation of assets developed and paid for by Plaintiffs will be used for the benefit of persons who have not invested over the years in violation of the 5th and 14th Amendment taking clauses.

74.    The Corporations assets have already been devalued by outsiders with the loss of the Corporations AA rating which will increase water charges to needed to pay higher interest

26

rates on debt, who have directly interfered with, destroyed, or seized the contractual/property rights of the Plaintiffs, City of Birmingham successors to founders, financiers for the last 75 years, and intended beneficiaries of the Charter of the Corporation.

75.     The Defendants listed above seized the property of the Plaintiffs and other similarly situated stakeholders, who are the investors and beneficiaries of the Charter until amended on June 27, 2025 without offering or providing "just compensation" as required by the Fifth Amendment.

76.     Although the shell of the Charter remains, the Charter rights of Plaintiffs have been gutted, which means that if only the shell of the Charter remains those actions of defendants under color of State law is an inverse condemnation which is still unconstitutional governmental action constituting a taking.

77.     The Legal basis of the Count II claims is that the Fifth Amendment protects private property (including intangible contract rights) from being taken for public use without just compensation and the Fourteenth Amendment applies this protection to the state and local government defendants actions in the caption above.

78.     Under these two Constitutional Amendments, the Fifth and the Fourteenth, Plaintiffs and those similar situated individuals have to have the Charter returned to its form in the last constitutional amendment in 1999 (Exhibit) or the State of Alabama and the Counties of Shelby and Blount have to pay each of the Plaintiffs and the other similarly situated investors and beneficial owners their individual proportionate portion of $1.6 billion the just compensation for the property seized.

**Class Allegations (Investor/ratepayers– and Intended Beneficiaries)**

79.    Plaintiffs bring Counts II, III, and IV pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all Investor/ratepayers and voters and property owners from the City of Birmingham  whose investments in the Corporation built and maintained the Corporation's assets for the last 75 years:

a.    Who prior to the June 27, 2025, Resolution eliminating section 6.02 of the Charter which required 5 board members elected by the governing body of the City of Birmingham by the "new" Board of the Central Alabama Water Company (which, to be sure, is an  illegal or unauthorized seizure of power or authority of the operations and assets of the Corporation) paid the Corporation's revenue bond and other debt which  built, purchased, financed, or contributed to the construction and maintenance of the Corporation's water works treatment plants and filtration facilities, fresh water reservoirs and raw water intake mains, large water transmission mains (or trunk mains) for transport, distribution mains for neighborhood delivery, and service lines and other assets developed and owned by the Corporation.

b.   Who as such Investor/ratepayers, voters, and property owners had accountability for the responsible use of their  payments of rates, fees, assessments, or charges used to pay the debt used acquire, construct, maintain, or expand the Corporation's system and its assets with the continued maintenance and operation  guaranteed by the Corporation's Charter which provided that the Board of Directors of the Corporation was to be selected by the governing body of the City of Birmingham who

28

served at the pleasure of such  class of Investor/ratepayers, voters, and property owners.

80.     The class includes the intended beneficiaries and Investor/ratepayers whose payments funded and capitalized the water utility system, by securing revenue bonds issued to acquire and develop the Corporation's capital assets and infrastructure.  The Corporation's water works assets comprising an approximately $1.8 billion asset base was financed through revenue generated from Investor/ratepayers, voters, and property owners, who collectively function as the foundational economic contributors and beneficial stakeholders in the Corporation's assets and management.

81.     The class is so numerous that joinder is impracticable. The water utility serves a large population of Investor/ratepayers over a multi-year period, and membership can be determined from billing and payment records maintained in the ordinary course of business.

82.     There are questions of law and fact common to the class, including whether Investor/ratepayer payments constituted investment-backed contributions giving rise to protected property interests; whether Investor/ratepayers are intended beneficiaries of the revenue bond structure used to finance the system; whether Defendants' conduct unlawfully interfered with or impaired those rights; whether the challenged actions constitute an unconstitutional taking or deprivation of property; whether Defendants impaired contractual obligations in violation of Article I, Section 10 of the Constitution; and whether declaratory and injunctive relief is warranted to protect class-wide interests.

83.     Plaintiffs' claims are typical of the claims of the class. Plaintiffs, like all class members, paid rates and charges that financed the acquisition, capitalization, and maintenance of

29

the utility system and its revenue bonds. Plaintiffs' claims arise from the same common course of conduct and are based on the same legal theories applicable to all class members.

84.    Plaintiffs will fairly and adequately represent the interests of the class. Plaintiffs have no interests antagonistic to those of the class and seek relief that benefits all Investor/ratepayer proportionally. Plaintiffs are represented by counsel experienced in federal class actions, constitutional litigation, and complex financial matters.

85.    Defendants have acted or refused to act on grounds generally applicable to the class, thereby making declaratory and injunctive relief appropriate respecting the class as a whole under Rule 23(b)(2).

86.    In addition, common issues predominate over any individual issues, including the legal characterization of Investor/ratepayer payments, the structure and legal effect of the revenue bonds, the existence of protected property or contract rights, and the legality of Defendants' uniform conduct toward all Investor/ratepayers. A class action is superior to individual actions because it promotes judicial economy, avoids inconsistent rulings, and ensures uniform adjudication of rights arising from a common financing structure.

**Violation of Property Owners' Rights**

87.    Plaintiffs, on behalf of the Investor/ratepayer Class, allege that Investor/ratepayers financed and capitalized the water utility system through mandatory payments, rates, and charges, which funded the acquisition and development  and maintenance of the Corporation's assets and secured revenue bonds issued for that purpose.

88.    Neither the State of Alabama nor any of the Counties served by the Corporation have any required mandatory payments and requested service from the Corporation on a

30

voluntary basis because each user based on their own cost-benefit analysis elected to request water from the Corporation when they ould have started and financed their own water supplier or simply dug a water well. All of the new areas serviced by the Corporation in other cities and Counties made the decision that water supplied by the Corporation was their best alternative with no compulsion of any sort,

89.    These payments were not gratuitous transfers but constituted investment-backed contributions that created protectable property interests, beneficial ownership interests, or equitable interests in the Corporation owned water works and its revenues.

90.    Defendants' actions have deprived Plaintiffs and the class of their protected property interests without due process of law and without just compensation, in violation of constitutional protections applicable to state actors.

91.    Defendants' conduct was undertaken under color of state law and pursuant to official policy, practice, or custom, and applies uniformly to all Investor/ratepayer

**Count III**

**SENATOR DAN ROBERTS, individually and in his official capacity acting under color of  State law, and Governor  KAY IVEY, individually in her official capacity acting under color of  State law, Governor KAY IVEY, Officially As Governor of The State of Alabama; Lt. Governor WILL AINSWORTH, officially As Lieutenant Governor of The State of Alabama; JAMES A. (JIMMIE) STEPHENS, Officially As President Of The Jefferson County Commission; Shelby County Commissioners KEVIN MORRIS, TOMMY EDWARDS,  JON PARKER,  WARD WILLIAMS, ELWYN BEARDEN, MIKE VEST, LINDSEY ALLISON,  RICK SHEPHERD, and  ROBBIE HAYES, Shelby County, a Governmental Entity; Blount County Commissioners , BRADLEY HARVEY, ALLEN ARMSTRONG, CHAD TRAMMELL,  CHASE MOORE, AND NICK WASHBURN, and Blount County a Governmental Entity; sued for**

**Impairment of Contract Clause Art. I, § 10, cl. 1. Which provides in relevant part
"No State shall pass any  Law impairing the Obligation of Contracts"**

**This Count is brought by Plaintiffs, and the Class of similarly situated voters and property owners in the City of Birmingham who invested into the Corporation by paying all of the revenue bonds used to purchase the stock of the Birmingham Water Works Company which formerly owned the system and by paying all of the property taxes and user fees and electing the governing body that transferred**

31

**at no cost or consideration the City of Birmingham owned  Industrial Water Board in 1993 and who are the intended beneficiaries  and stakeholders in the Corporation who have a derivative right, no different that shareholders of an investor owned water utility, to enforce the terms of the Corporations' Charter which is a contract with the State providing three founders with the right to organize the Corporation and establish the Articles or Charter that control how the Board of Directors are elected and the terms of offices that has been impaired by Defendants enforcement and implementation of two acts of the legislature leading to an actual amendment of the Corporation's Charter making a gift of the Board seats to persons and formal taking of the Corporations' assets on Jule 27, 2025.  The above defendants are sued for enforcing state laws or actions that were known and intended to deprives the Plaintiffs and the class of similarly situated individuals of their rights under the Charter to vote for a governing body that appointed a five member Board in Derogation of and which is a substantial impairment of Art. I, § 10, cl. 1. under 42 U.S.C. § 1983**

92.     This Count III is being brought against the State of Alabama Senator who sponsored the second prong of legislation and the Governor that signed and implemented the legislation knowing that the "coup" leading to the  replacement of the Board selected under the contract provisions of the Corporation Charter by their immediately firing on the day the legislation became effective was unconstitutional in violation of the Corporation's Charter.

**Impairment of Contract, U.S. Const. Art. I, § 10, cl. 1**

93.     Plaintiffs hereby allege the provisions of paragraphs 79-86 above in Count II as if fully stated in this Count III.

94.     Plaintiffs, on behalf of the Investor/ratepayer Class, allege that the revenue bond structure and governing instruments created binding contractual relationships among the issuer, the Corporation's water works, and the Investor/ratepayer whose payments secured and serviced the bonds that built and acquired the water works.

95.     Investor/ratepayers, as the source of pledged revenues and as intended beneficiaries of the financing structure, possess enforceable contractual rights arising from the bond covenants, rate covenants, and related governing documents.

32

96.     Defendants have enacted or enforced measures that substantially impair these contractual obligations by altering the rights, expectations, and security interests inherent in the financing structure.

97.     Such impairment is substantial, not reasonable or necessary to serve an important public purpose, and violates the Contract Clause of Article I, Section 10 of the United States Constitution.

98.     A privately formed and organized corporation under the rules of State of Alabama law must be governed by its Charter and the 1999 Charter of the Corporation was impaired, for purposes of the 5th Amendment, by  amendment or modification on  June 27, 2025 by new Board members putatively appointed the day after the old Board Members authorized under Sections 6.02 and 6.06 of the Charter were terminated.

99.     Accordingly even if the legislation firing the old Board is found to be enforceable (and I was not), that new Board could not validly act until appointed pursuant to a Charter amendment that did not occur until June 27, 2025 that eliminated section 6.02 requiring 5 board members elected by the Birmingham City Council and section 6.06 invalidating or impairing the requirement that old, terminated Board member keep their office and may take valid actions until the new board member takes his or her seat.

100.     This means the buy-sell agreement approved by the City was approved before the new board was seated is protected against impairment by Contract Clause of Article I, Section 10 of the United States Constitution.

101.     Furthermore, the vote by the new board to disapprove has no force and effect as the Buy-Sell Agreement was accepted by the City before it could be withdrawn by the new board, which was not appointed until the day after the old board was terminated.

102.    The old board's authority continued after they were terminated until the new board was appointed.  No corporation can exist without a continuously empowered board.

103.    Plaintiffs will be seeking injunctive relief by motion to enforce the Charter provisions that are not in dispute against all Defendants in order to nullify any purported modification or recission of the Buy-Sell Agreement by and between the City and the Company.

104.    Water Works is a public corporation formed pursuant to State grant of authority under Ala. Code §11-50-230 et seq..  The Contract Clause of Article I, Section 10 of the United States Constitution prohibits the State from changing the rights thereunder by unilaterally stating the Corporation is governed by Ala. Code §11-50-300 et seq.

105.    The Water Works is a distinct  legal entity or "person" under the Contracts clause and has the right to constitutional protection of it obligation of contract in its Articles of Incorporation or Charter as authorized by the City under §11-50-232.  See, *Water Works Bd. of Leeds v. Huffstutler*, 292 Ala. 669, 677, 299 So.2d 268, 276 (1974) (adopting the order of the trial court, which stated that a water board was " 'an entity separate and independent from the city which it serves' ").

106.    The City of Birmingham is an arm of the State which approved the incorporation of the Corporation in 1950.  Plaintiffs can find no evidence of City approval of the 1999 Amendment and restatement as required by state law.  This issue is subject to further discovery.

107.    The Defendants approved and acted under color of Act 25-297 to modify and impair the obligations in the Charter approved by the individual electors and incorporators but authorized by Birmingham as an arm of the State of Alabama  creating contract rights approved by the State political subdivision that accrue to  the three natural person incorporators protected by the 5th Amendment and binding on the State through the 14th Amendment. and between the

34

City and Birmingham and the successors in interest to the original incorporators, who are the primary investors and beneficiaries of the Corporation's Charter.

108.    The City of Birmingham is an arm of the State and any action taken by the State of Alabama to breach the Corporations' Charter or purporting to cause its City to breach its contractual obligations under the Charter to appoint the 5 member Company Board and approve any amendments to the Charter is State of Alabama action expressly prohibited by the Contracts Clause.

109.    Act 2025-297's attempt to modify the Charter, which is the contract between the Water Works and the intended Plaintiff/beneficiary/investors to pay the revenue bonds used to purchase the hard assets being transferred to the Governor and her political allies, is a state action impairment of the Charter which takes away from the plaintiffs and similarly situated individuals their contract rights under the Charter.

110.    Plaintiffs are the beneficial owners and stakeholders of the Corporation who funded or financed the purchase the Corporation assets  in reliance on their  contract right to enforce the Charter and Ala Code 11-50-230 et seq., and therefore 2025-297 violates the Contracts Clause of the United States Constitution.

111.    The Contract Clause expressly applies to States: "[n]o State shall…pass any…Law impairing the Obligation of Contracts…" U.S.C.A. Const. Art. 1, § 10, cl.

112.    Pursuant to the 1999 Charter, a contract was created enforceable by the Plaintiffs as investors, beneficial owners, and intended beneficiaries of the Corporations purposes that gives  Plaintiffs an immutable express contractual right to hold accountable the governing body which appoints and fill vacancies of board members of the Corporation.

113.     As consideration for its appointment authority, the City governing body, accountable to Plaintiffs, did not object to  the amendment to the Corporation's 1999 Charter

114.      Act 2025-297 substantially impairs the Plaintiffs' contractual rights by modifying and/or replacing the Company's charter containing those contract rights.

115.     As a privately incorporated non-municipal non-political subdivision public water utility corporation, totally separate from the City of Birmingham, the Charter provisions  are the only laws that govern the Corporation's activities and therefore constitute a contract between the Corporation and the Plaintiffs and the class the represent who fund and purchase its revenue bond debt that funds and purchase the Corporation assets now wrongfully seized and transferred for political payoffs.

116.

117.     The drafting of the provisions of  the Charter was solely within the discretion of the three individuals, voters and property owners,  who formed and incorporated the Corporation, and accordingly the Corporation has the right to have Board members selected by whatever process the private individuals forming the Corporation chose, including without limitation the delegation to the council the right to appoint its Board of Directors free from impairment by the State.

118.     Act 2025-297 only applies to the Water Works and only substantially impairs the Charter of this single Company in the State of Alabama by retroactive legislation allowing State agents to attempt to  modify the right of the Company to establish its Charter under color of state law in violation of a  perpetual agreement with beneficial owners offered as a contract right by the State under Ala. Code §11-50-230 et seq.

119.    Plaintiffs have the right and standing to enforce the Corporation's contract set forth in its Charter in which it legally provided that the Plaintiffs have the right to elect the governing body that has the appointment authority taken under color of state law and sequestered by Act 25-297 .

120.    As the parties directly injured by the purported termination of the Corporation's Charter by Act 2025-297, Plaintiffs, and other similarly situated individuals, have the right to bring this lawsuit against the State officials who implement the State law in violation of Constitution prohibiting impairment of the Charter or Articles of Incorporation of the Company modified in 1999...

121.    The false, fictional  and mis-associated recitals in Act 25-297 show clearly that the contract impairment of the Articles of Incorporation is completely  unreasonable and not designed or tailored to achieve any legitimate public purpose.

122.    Included in the Articles of incorporation is Section 6.06 that provides that  if a directors term expires, he or she continues to act until a successor is elected.

123.    Under the Charter of the Corporation, the Buy-Sell agreement  wherein the Water Works agreed to sell the Company to the City for repayment of all outstanding debt plus $1.00 is one of the powers of the Company in Section 5.10 of the Articles.

124.    The Buy-Sell agreement was approved by sitting directors, terminated by Act 2025-297 before their successors were appointed making the Buy-Sell Agreement and enforceable contract under the Federal and State Contracts clauses and under state of Alabama contract laws.

125.    Any purported impairment by actions taken by Act 2025-297 also substantially impairs the Buy-Sale agreement between the Plaintiffs, and those individuals similarly situated, and the Corporation, and therefore violates the Contracts Clause.

126.    On or about May 6, 2025, the City of Birmingham approved a "Buy-Sell" Agreement authorizing the sale of Water Works assets back to the City of Birmingham.

127.    On or about May 7, 2025, the Birmingham Water Works Board approved the "Buy-Sell" Agreement authorizing the sale of Water Works assets back to the City of Birmingham.

128.    On or about May 14, 2025, the Regional Board Members, under the alleged authority provided by Act 2025-297, voted to rescind the Buy-Sale contract.

129.    Act 2025-297 also substantially impairs the Plaintiffs, and those individuals similarly situated,' contractual agreements with the Corporation  that the legislation completely eviscerates the Plaintiffs, and those individuals similarly situated,' right to approve amendments to the Company's articles of incorporation. §11-50-232(b), Ala. Code 1975.

130.    Act 2025-297 also works to ameliorate the Plaintiffs, and those individuals similarly situated,' reversionary property right as established under §11-50-237(c) of the Alabama Code in violation of the Contracts Clause.

**Count IV**

**COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF
(Violation of Equal Protection Clause,
14th Amendment, U.S. Constitution)
Senator Dan Roberts, individually, and Governor  Kay Ivey, individually,  Governor Kay Ivey,
Officially As Governor of The State of Alabama; Lt. Governor Will Ainsworth, officially As
Lieutenant Governor of The State of Alabama; James A. (Jimmie) Stephens, Officially As President
Of The Jefferson County Commission; Shelby County Commissioners Kevin Morris, Tommy**

**Edwards, Jon Parker, Ward Williams, Elwyn Bearden, Mike Vest, Lindsey Allison, Rick Shepherd, and Robbie Hayes, Shelby County, a Governmental Entity; Blount County Commissioners , Bradley Harvey, Allen Armstrong, Chad Trammell,**

131.  Plaintiffs hereby allege the provisions of paragraphs 79-86 above in Count II as if fully stated in this Count IV.

132.  The Equal Protection Clause requires the government to treat similarly situated persons in a similar manner. *Gary v. City of Warner Robins, Ga.*, 311 F.3d 1334, 1337 (11th Cir. 2002).

133.  The United States Supreme Court has recognized, as recently as 2023, that "'Alabama's extensive history of repugnant racial and voting-related discrimination is undeniable and well documented.'" Allen v. Milligan, 599 U.S. 1, 22, 143 S. Ct. 1487, 1506, 216 L. Ed. 2d 60 (2023) (quoting Singleton v. Merrill, 582 F. Supp. 3d 924, 1020 (N.D. Ala. 2022)).

134.  In all other Cities in Alabama, except Birmingham, §11-50-230 et seq. continues to authorize citizen electors and property owners and Investor/ratepayers to authorize a water works to operate the drinking water supplier company in their locality and in adjoining areas who prefer the City water company over other alternatives.

135.  In all other cities in Alabama, the board of the citizen organized and incorporated water company is appointed by the governing body of the city that the electors and property owners and Investor/ratepayers put in office.

136.  §11-50-230 et seq. is voluntary. The Corporation is a water company established by, with a Charter created by three private, natural individuals to handle the community water supplies not a water works established by State or local governmental ordinance or action.

137.  Municipal water works are created by ordinance; the Corporation was created by the filing of its Charter that governs is powers. The Plaintiffs, and those individuals similarly

39

situated, who are voters, and property owners and Investor/ratepayers whose user fees constitute their investments that pay the operating costs and the debt service on the revenue bonds that pay for the capital costs of and improvements in the system have a stake in keeping the Board management local as opposed to being taken over by State Officials and adjoining counties who have made little or no investment in the water utility system assets.

138. The Plaintiffs, and those individuals similarly situated, as individuals represent themselves and other similarly situated electors, property owners and Investor/ratepayers in the City of Birmingham and in that capacity sue for injunction relief and declaratory relief that Act 25-297 is unconstitutional.

139. True to history, the selection scheme mandated by Act 2025-297 deprives individual Plaintiffs' Muhammad and Lewis, who are voters, property owners and Investor/ratepayers individually and as representatives of others similarly situated (hereinafter "the Investor/ratepayer Plaintiffs") of the effective and meaningful participation in the affairs of Water Works which their dollars as user fees were expended to build and enlarge and maintain and operate the Water Works system for the last 75 years.

140. Because the Board has no shareholders, the Investor/ratepayer plaintiffs also represent the investment interest of the property owners and Investor/ratepayers who elect them to office and reserve the right to remove them if their and their predecessors 75 year investment in the Company is not protected.

141. The Birmingham voters and property owners and Investor/ratepayers who represented by the Investor/ratepayer Plaintiffs have the biggest investment in the $1.88 billion in utility assets owned by the Company that any other group that is allowed to appoint a Board member. There is no law or reason for the State to require a privately formed, financed and

founded and owned company to  reject its Charter Board appointment rules and replace its Board members with representatives of its customer base and State officials.  The Corporation is not a political subdivision requiring equal representation of voters on a Board. It  is a privately incorporated entity.

142.    To be sure giving a County Commission where a reservoir is located the right to have a director is completely pretextual because anyone who owns some land under the Alabama Riparian system can take for free as much water and the reservoir they dig can hold.  The Corporation takes water from a reservoir that is served by a river that runs through 2000 acres of land purchased by the taxpayers in Birmingham in the 1930's.  The State just gave that land away to a county governing body for no compensation of its fair market value back to the city of Birmingham and their taxpayers and for no public safety, public health, or police power justification.

143.    By law the City's and its taxpayers investment in the 2000 acres giving it riparian rights to draw water must be paid back to the City and its taxpayers  at fair market value.

144.    Having a Corporation own 2000 acres of undeveloped land within Blount County that has 416,000 acres a total of is just no big deal and certainly does not deserve a seat to control a billion dollar Company.

145.    Many timber companies in Blount County, like Resource Management Service (RMS), Weyerhaeuser Company, Rayonier, and Hancock Natural Resource Group. for example, own timber tracts in excess of 50,000 acres and Defendant Dan Roberts has not sponsored legislation to have the Blount County Commission put a director on either of their Boards.

146.    Alabama Power has a reservoir called Lay Lake in Shelby County 10 times larger than the reservoir purchased by Birmingham in Blount County (called Inland Lake) and Senator

Roberts has not sponsored legislation to have Shelby County Commission put a Board member on Alabama Power's Board.

147. Alabama Power had an "A" credit rating at the time the Governor took over the Corporation and the Corporation had a much higher "AA" rating but Governor Ivey did not sign a bill to fire the Alabama Power Board for mismanagement since the Investor/ratepayers of the State would have much lower bills if the rating was equivalent to the "AA" Corporation's Rating.

148. The credit rating indicates the quality of management. Based on the "AA" rating the Board show have been given a governors proclamation for a job well done rather than getting fired for mismanagement.

149. The Governor's takeover has now resulted in a lower rating that is heading towards Alabama Power's "A" rating. The logic of the State defendants is the higher the rating the more we want to accuse the company of mismanagement and take over the Board and put in Governor's political supporters and cronies and Board members.

150. These comparisons, showing differential treatment of the Corporation in the States takeover of all of the Corporations management and assets and the property rights of its beneficiaries and stakeholders to elect the representatives who appointed the Board for mismanagement and the turnover of management of the Corporation to elected political supporters of the Governor that achieved the highest rating in the water works business, makes an open and shut case for the denial of equal protection,

151. Act 2025-297 applies exclusively to the Corporation as the Corporation is the only current water utility that fits the criteria stated in the legislation.

152. Act 2025-297 exclusively dilutes the Investor/ratepayer Plaintiffs' contract rights guaranteed by 11-50-230 under which it was formed allowing Plaintiffs to impact representation to the Corporation Board to protect their investment in the Corporation.

153. Act 2025-297 treats the Investor/ratepayer Plaintiffs differently than similarly situated Investor/ratepayers in predominately White cities and counties.

154. The Defendants have intentionally discriminated against the Investor/ratepayer Plaintiffs as is evidenced by the following:

    a. Alabama has an extensive history of repugnant racial voting-related discrimination.

    b. Act 2025-297 only applies to the Corporation.

    c. Act 2025-297 only dilutes the appointment authority of the Investor/ratepayer Plaintiffs who are residents of the majority Black City of Birmingham.

    d. Act 2025-297 treats the Investor/ratepayer Plaintiffs differently than similarly situated Investor/ratepayers in predominately White counties.

    e. The Corporation's strong "AA" credit rating (a rating that is shared by the State) contradicts Act 2025-297's "findings" of mismanagement or incompetence.

    f. Act 2025-297's finding relating to mismanagement leading to unreasonable "high rates that oppress residents and that are a barrier to economic development" is pure speculation and conjecture given the fact that a "AA" credit rating means lower interest rates on over a billion dollars of Corporation debt which means lower water rates to the consumer.

g. Act 2025-297's legislative "findings" relating to regionally specific catastrophic events are completely unrelated to the Corporation and have no relation to its management.

h. There is no objective evidence of the Corporation "transferring" substantial funds to the City of Birmingham because that "finding" is false.

155. Thus, Act 2025-297 has a discriminatory purpose and intent which may be asserted by Plaintiffs who are the intended beneficiaries, primary investors, and persons having property rights in the Charter provisions governing the selection of the Board which were violated by Act 2025-297.

156. Act 2025-297 clearly denies the intended protections of the Equal Protection Clause of the United States Constitution to Plaintiffs, and the individuals similarly situated who the represent, who are the only group of water works funders, voters and property owners from whom the right to establish a locally controlled water works has been abridged by the State of Alabama defendants above under color of state law under 42 U.S.C. § 1983 and 1985(3).

EQUAL PROTECTION (CLASS OF ONE)

157. A valid equal protection claim may be asserted by "a 'class of one,' where the plaintiff alleges intentional disparate treatment or being treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 1074, 145 L. Ed. 2d 1060 (2000).

158. The Alabama legislature has singled out the Corporation, which had before the takeover the highest credit rating and water quality of any water works in the State of Alabama

44

while been governed either by all, or after Act 2015-164 by a majority of, members appointed representatives elected by Plaintiffs to protect their financial investment, beneficial ownership, and intended beneficiary  and property ownership within the Corporation's service area  for disparate treatment under Act 2025-297.

159.    This Act by definition discriminates against Plaintiffs because every other financial investor /ratepayer, beneficial owner, intended water works service beneficiary  and property owner in every other city in the State is permitted to designate three incorporators to establish a water works who will charge rates no higher than needed to maintain and make capital improvements to the water system for the benefit of all Investor/ratepayers and property owners in the city except  Plaintiffs and the class Plaintiffs represent.

160.    A partial list of other cities where financial investor/ratepayer, beneficial owner, intended water works service beneficiaries  and property owners have been permitted by State law to establish a locally controlled water works is attached as Exhibit F.

161.    Act 2025-297 applies exclusively to the Corporation which is the only current water utility that fits the criteria stated in the legislation in the State of Alabama.

162.    As shown the map attached as Exhibit F, it is ***geographically impossible*** for any other potable water supplier that the legislation has not already excepted, to ever meet the criteria for loss of local board control and take over by State and surrounding elected officials who appoint 86% of the Boards voting power.

163.    The map is Exhibit F shows it is geographically impossible to have a water works that does not sell wholesale, to have operations or property in four or more counties as required by 2025-297.

164.    The Alabama legislature has not sought to restructure or take over other public utility companies with credit ratings equal to or lower than that of the State of Alabama and the Corporation.

165.    2025-297 has a lot of exceptions or classifications.  The more exceptions the more likely you have an equal protection violation.

166.    Act 2025-297 contains "findings" that purportedly justifying the Alabama legislature's actions in that Act. However, those findings are false and/or pretextual and do not constitute a rational basis for the action taken by the Alabama legislature in Act 2025-297.

167.    In reducing the City council's power to appoint members to the Corporation Board from 5 out of 5 to 1 out of 7, Act 2025-297 deprives the Plaintiffs and the class hey represent, which include voters in the City of Birmingham of the extremely valuable property rights reflected in the Charter's Board selection provisions.

168.    The right of Plaintiffs Investor/ratepayers, beneficial owners, intended water works service beneficiaries  and property owners right to elect the City Council members who have the right to elect 100% of the Corporation's directors is one of the most valuable rights attendant to a public benefit water works company established by individual stakeholders under §11-50-230 et seq.   Election of directors is where the representatives the Plaintiffs put on the City Council can directly exert their influence on the Corporation, and few matters are more central to a Corporation's governance than its ability hold valid elections of board members to the Company.

169.    Act 2025-297 eliminate all possibility of being able to elect a City Councilor from a Investor/ratepayers district  that will be able to select a Board member to exert any influence for the benefit of the Plaintiffs' which will protect their interest by selecting a majority of

Birmingham residents as their representation to the Corporations Board because 5 of seven Board members will always represent interests antagonistic to the City of Birmingham.

170. Act 2025-297 clearly discriminates against the Investor/ratepayer Plaintiffs, impermissibly treating them differently than similarly situated Investor/ratepayers who have paid users fees leveraged to build out the water system without any rational basis.

171. Thus, Act 2025-297 conclusively violates the Equal Protection Clause of the United States Constitution.

### *Declaratory and Injunctive Relief*

172. Plaintiffs, on behalf of the classes described above, seek declaratory relief determining the respective constitutional, property, and contractual rights of Board members and Investor/ratepayer-beneficiaries.

173. An actual and justiciable controversy exists regarding Defendants' authority and the legality of their actions affecting the governance, ownership interests, and contractual protections associated with the governance of the Corporation.

174. Absent declaratory and injunctive relief, Plaintiffs and the classes will suffer irreparable harm, including loss of constitutional rights, impairment of contractual protections, and deprivation of property interests for which there is no adequate remedy at law.

175. Plaintiffs seek preliminary and permanent injunctive relief prohibiting Defendants from enforcing or implementing actions that violate the rights described herein and such further relief as the Court deems just and proper and enforcing the already approved Buy-Sell Agreement.

### **PRAYER FOR RELIEF**

**WHEREFORE, PREMISES CONSIDERED**, in addition to Declaratory Relief, above,

Plaintiffs request such additional relief that, this Honorable Court deems appropriate.

Respectfully Submitted,

*/s/Calvin Grigsby*
**Calvin Grigsby**

*/s/ Richard Rice*
**Richard Rice**

*/s/ Johnathan F. Austin*
**Johnathan F. Austin**

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of February 2025, the undersigned served a copy of

the forgoing on the following by electronically filing same using the CM/ECF system, which will

send notification to the following:

James W. Davis
Scott Woodard
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
Post office Box 300152
Montgomery, Alabama 36130-0152
Jim.Davis@AlabamaAG.gov
Scott.Woodard@AlabamaAG.gov
Attorneys for Defendant, Governor Kay Ivey

*/s/ Calvin Grigsby*
**Of Counsel**

**DEFENDANTS TO BE SERVED PERSONALLY BY PRIVATE PROCESS SERVER:**

Kay Ivey
Governor of Alabama
Address to be served

48

Former GOVERNOR ROBERT BENTLEY
Address to be served

Dan Roberts
Senator
Address to be served

Jabo Waggoner
Senator
Address to be served

Will Ainsworth
Lieutenant Governor of the State of Alabama
Address to be served

Steve Marshall
Alabama Attorney General
Address to be served

James A. (Jimmie) Stephens
President of the Jefferson County Commission
Address to be served

Shelby County Commission
Address to be served

Shelby County Commissioners Kevin Morris, Tommy Edwards,  Jon Parker,  Ward Williams, Elwyn Bearden, Mike Vest, Lindsey Allison,  Rick Shepherd, And  Robbie Hayes,
Addresses to be served

Blount County Commission
Address to be served

Blount County Commissioners , Bradley Harvey, Allen Armstrong, Chad Trammell, Chase Moore, And Nick Washburn
Addresses to be served

                                                              */s/ Calvin Grigsby*
                                                              **Of Counsel**