FILED
2026 Mar-21  AM 03:24
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

WILLIAM MUHAMMAD and BRENDA )
LEWIS,                                                    )Case No: __2:26-cv-00292-AMM__
                                                                )
    Plaintiffs,                                    )
                                                                )
vs.                                                             )
                                                                )
STATE SENATOR JABO WAGGONER,)
et al.,                                                         )
    Defendants.                                 )

### PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65 and 28 U.S.C. § 1651, Plaintiffs William Muhammad and Brenda Lewis, individually and on behalf of the class of similarly situated electors, property owners, former Board members, and investor/ratepayers of the City of Birmingham, respectfully move this Court for: (1) an immediate Temporary Restraining Order (TRO); and (2) a Preliminary Injunction, restraining Defendants and their agents, officers, employees, and all persons acting in concert with them from taking further actions that permanently destroy the internal structure, governance, institutional workforce, and capital integrity of The Water Works and Sewer Board of the City of Birmingham (the "Corporation"), now operating under the name "Central Alabama Water."

1

## I. INTRODUCTION AND BACKGROUND

This emergency motion is necessitated by rapidly escalating, irreversible harm being inflicted upon the Corporation, its 600-employee workforce, and the over 600,000 Birmingham-area electors, property owners and residents whose predecessors in beneficial interest founded and funded the Corporation and who depend upon the Corporation for safe drinking water. The unlawfully installed leadership of the Corporation acting under the constitutionally infirm Act 2025-297 and the Unlawful June 2025 Resolution is simultaneously:

    a. conducting a sweeping and targeted reduction-in-force ("RIF") that has terminated over 200 experienced, senior employees voters and property owners who live and pay taxes predominantly in the City of Birmingham since March 13, 2026;

    b. implementing personnel policies that were never approved by the Board of Directors;

    c. proposing to increase Board compensation by up to $60,000 per member per year;

    d. wasting investor/ratepayer funds on corporate rebranding; and

    e. refusing critical dam safety capital investment recommended by Jacobs Engineering creating a direct and escalating public health emergency.

Time is of the essence.

## II. STATEMENT OF FACTS

**A. The Unlawfully Constituted Board and CEO's Claim of Expanded Authority**

1. As established in Plaintiffs' Partial Motion for Summary Judgment, filed contemporaneously herewith, the Corporation's Board of Directors has been unlawfully reconstituted under Act 2025-297 and the Unlawful June 2025 Resolution, in violation of the Corporation's 1999 Amended Charter, the Fifth and Fourteenth Amendments to, and the Contracts Clause of, the United States Constitution. The current Board lacks lawful authority to govern the Corporation.

2. Section 6.01 of the Corporation's 1999 Amended Charter expressly provides that "[t]he management and all operations and policies of the Board shall be subject to determination and control by the board of directors" and that "[a]ll officers and employees shall hold office or employment subject to termination by the Board." The CEO therefore has no independent authority to implement personnel policies, handbooks, or terminations absent Board approval.

3. CEO Jeffrey Thompson has taken the position that Act 2025-297 gives him "expanded rights" to act unilaterally on personnel matters without Board approval. As confirmed by the Corporation's own legal counsel, Board member Jarvis Patton, and State Representative Juandalynn Givan (a licensed employment

3

attorney), this position is legally incorrect. At a public Board meeting on or about March 7, 2026 (AL.com, March 7, 2026), the Corporation's Board attorney Shan Paden was compelled to concede: "I'm telling you that you set policy, alright" — confirming that policy authority belongs exclusively to the Board, not the CEO.

**B. The Unauthorized Employee Handbook and Drug Testing**

4.     In January 2026, CEO Thompson implemented a new employee handbook for the Corporation's approximately 600 workers without Board approval. The handbook introduced a zero-tolerance drug testing policy, eliminated the Corporation's longtime employee association, and made other significant policy changes. None of these changes were approved by the Board of Directors as required by Section 6.01 of the 1999 Amended Charter.

5.     Following implementation of the unauthorized handbook, the Corporation conducted surprise mandatory drug testing that resulted in dozens of employees being fired on the spot or forced to resign. Several employees report being terminated for legally prescribed medications. The tests used were rapid-response tests, which are less reliable than laboratory tests. The Corporation has refused to disclose to date:

    a.  how many employees were tested;

    b.  how many were terminated;

   c.  what departments were affected;

   d.  what specific substances were tested; or

   e.  the racial breakdown of those terminated the latter having been specifically requested by State Rep. Givan.

6.    The unauthorized new handbook contains no mention of the Corporation's longtime employee association effectively abolishing it without Board authorization. AKhi King, the recently elected president of the employee association, was summarily terminated, allegedly for using his work computer to compile and forward employee questions to management ahead of a town hall, an act of collective employee communication that the unlawfully installed management has treated as grounds for dismissal.

## C. The Mass Reduction-in-Force (RIF) and Public Health Crisis

7.    Beginning on or around March 13, 2026, the Corporation began a sweeping reduction-in-force, terminating over 200 employees in a matter of days. The RIF disproportionately targets the highest-paid, most experienced, and most senior members of the workforce, precisely those personnel with the deepest institutional knowledge of the Corporation's water treatment operations, infrastructure maintenance, and regulatory compliance obligations.

8.     These terminations are creating a severe public health crisis. The Corporation operates major water treatment plants, transmission and distribution mains, reservoirs, and dam infrastructure serving over 600,000 residents. The loss of experienced technical and operational personnel directly threatens the Corporation's ability to safely and reliably treat, transmit, and deliver potable water in compliance with federal Safe Drinking Water Act standards and applicable state environmental regulations.

9.     The board meeting scheduled for March 20, 2026, will address the policy issues raised by Board member Patton and confirmed by the Corporation's attorney making this the last opportunity for the Court to intervene before further permanent harm is effectuated through additional terminations, policy implementation, and governance decisions.

## D. Financial Mismanagement: Board Pay, Rebranding, and Capital Investment Refusal

10.     The unlawfully constituted Board has proposed increasing its member compensation to up to $60,000 per member per year, a significant diversion of investor/ratepayer funds to benefit those who gained Board control through the unconstitutional takeover, and directly contrary to the Corporation's Section 6.02 Charter provision limiting Board compensation to what is "provided by law."

11.    The Corporation has authorized expenditures on new logos and corporate rebranding as "Central Alabama Water", changes of no operational or public health value that waste ratepayer funds at a time when the Corporation is simultaneously conducting mass layoffs and deferring capital investment.

12.    Most critically, the Corporation has refused or delayed critical capital investment in a dam safety project administered by Jacobs Engineering. The Corporation's infrastructure includes major dam and reservoir assets that provide drinking water to hundreds of thousands of residents. Deferral of dam safety capital investment creates a direct, escalating, and potentially catastrophic public health and safety risk that cannot be remedied after the fact. At the same time, the Corporation's credit rating has already begun declining from its "AA" level as a direct consequence of the takeover and management instability raising borrowing costs and thereby increasing future water rates to Birmingham investor/ratepayers.

13.    Act 2025-297 attempts to micro-manage a Corporation which is funded without any State or other State entity of municipality dollars which has proven its ability to manage and grow a water services business for the last 75 years. This legislation must be temporarily enjoined absent hearings and findings showing the need to single out the Corporation for Alabama governmental management where there is no public emergency. The State legislation has increased financing costs by negative press releases on the mismanagement of the Corporation that are not based

in fact.  For example a recent report with the investigation designed to justify after the fact claims of mismanagement lacked any objective findings and reported as "catastrophic" the fact that the costs of maintenance and operation of a 75 year old water system with deferred maintenance and aging water mains are increasing faster than inflation when this is the case with all aging water systems nationally.  The report identifies problems facing all aging water systems as if this is the fault of management that older pipelines need significant capital investments to replace. The net result of such self-serving reports to justify the legislative takeover is that investors are becoming more skittish about owning the Corporations bonds causing borrowing costs to increase which must be passed to water customers as higher rates.

14. Act 2025-297 has requirements that were written by legislators who have no experience in management of water systems and that legislation has caused inefficiencies which cause costs for the system to increase rapidly. For example, the Act's requirement of a nationwide search for a consulting engineer not only requires an increased budget to pay for the engineer, but the selection process is also time consuming and no new financing can be completed until the engineer has had sufficient time which will be several months to understand how the system works, and the Corporation already has dozens of engineers which provide those functions contemplated by the Act.

15. In short the new legislation is making a "sideshow" of fixing a Water Works that is not broken all to justify a legislative takeover that appears racially motivated.

**E. The Unlawful Rescission of the Buy-Sell Agreement**

13. On May 6, 2025, the City of Birmingham approved a Buy-Sell Agreement for the return of the Corporation's assets to City stewardship. On May 7, 2025, the Corporation's then-lawfully constituted Board approved the agreement. On May 14, 2025, persons purporting to act as a new Regional Board voted to rescind the Buy-Sell Agreement, an action that was unlawful because the new Board was not yet lawfully constituted and the agreement had already been accepted by the City. Plaintiffs seek injunctive relief enforcing the Buy-Sell Agreement and prohibiting further actions by the unlawful Board in derogation of it.

## III. LEGAL STANDARD

A TRO and preliminary injunction are appropriate where the moving party demonstrates:

a. a substantial likelihood of success on the merits;

b. irreparable injury absent relief;

c. that the balance of harms favors the movant; and

d. that the injunction would not be adverse to the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). All four factors are amply satisfied here.

9

## IV. ARGUMENT

**A. Substantial Likelihood of Success on the Merits**

As fully briefed in Plaintiffs' Partial Motion for Summary Judgment, Plaintiffs are substantially likely to prevail on all four Counts. The Corporation is a private public benefit corporation formed by individual electors under Ala. Code § 11-50-230 et seq., protected from State interference by the Contract Clause. See Dartmouth College, 17 U.S. 518. Act 2025-297 unconstitutionally impairs the Corporation's Charter, strips Birmingham investor/ratepayers of Charter-guaranteed property rights without just compensation, removes duly appointed Board members without due process, and denies Birmingham's majority Black community equal protection of the law all violations directly actionable under 42 U.S.C. §§ 1983 and 1985(3).

Additionally, the CEO's implementation of personnel policies without Board approval is ultra vires under Section 6.01 of the 1999 Amended Charter, which expressly reserves all management, operations, and policy authority including authority over officers and employees to the Board of Directors. The Corporation's own Board attorney has confirmed this. All actions taken by the CEO and Board under unauthorized policies are therefore void and subject to injunctive relief.

**B. Irreparable Harm Absent an Injunction**

10

1. The harm already being inflicted is irreparable in multiple respects. First, the mass termination of over 200 experienced, senior employees is permanently destroying institutional knowledge, operational expertise, and workforce continuity that cannot be recreated or monetarily compensated. Terminated employees will find alternative employment; the specialized technical knowledge of water treatment, infrastructure management, and regulatory compliance will be permanently lost to the Corporation.

2. Second, the deferral of the Jacobs Engineering dam safety capital project creates an ongoing and escalating public health emergency. Infrastructure deterioration of dam and reservoir assets serving over 600,000 residents can cause catastrophic, irreversible harm to public health that monetary damages cannot remedy after the fact.

3. Third, the diversion of investor/ratepayer funds to increased Board compensation and corporate rebranding at a time when capital investment is being deferred and the workforce is being decimated, depletes the Corporation's financial capacity in ways that compound over time, particularly given the already-declining credit rating.

4. Fourth, the elimination of the employee association and the retaliatory termination of its president, AKhi King, silences the internal checks on management misconduct and creates an environment of fear among remaining

employees, further accelerating institutional deterioration and impairing the Corporation's ability to attract and retain qualified technical personnel.

5. Fifth, the continued operation of the Corporation under the unauthorized employee handbook implementing policies never approved by any lawful Board, exposes employees to ongoing legal harm and creates potential liability for the Corporation and its investor/ratepayers.

6. Sixth, the actions taken in the name of correcting mismanagement have all the signs of just a pretensive cover up for eliminating long term jobs being held by African American employees and replacing those employees with white workers.

## C. Balance of Harms Strongly Favors Injunctive Relief

Defendants suffer no cognizable harm from an order:

    a. pausing further employee terminations;

    b. reinstating terminated employees;

    c. restoring the employee association;

    d. requiring resumption of the Jacobs Engineering dam safety project;

    e. prohibiting the Board pay increase and rebranding expenditures; and

    f. preserving the pre-June 27, 2025 status quo.

    g. Barring further job terminations and reinstate all employees terminated in the last three months absent a full due process hearing with a Director

of Workplace Relations appointed by the Court where there is evidence that assorted layoff justifications could be a pretense for replacing African American workers with white workers.

By contrast, the harm to Plaintiffs, the class, the Corporation's workforce, and the public from allowing these actions to continue is severe, ongoing, and increasingly irreversible.

## D. The Public Interest Strongly Favors an Injunction

The public interest is plainly and compellingly served by preserving the operational integrity, workforce expertise, and financial capacity of a water utility serving over 600,000 Birmingham-area residents particularly where the deferral of dam safety investment may threaten public health on a catastrophic scale. The public interest is also served by preventing the permanent destruction of a public benefit corporation's institutional structure based on unconstitutionally exercised authority. As Board member Patton stated publicly: "If I've got a bad piece of paper and I'm operating without proper authority, I'm in violation of something, aren't I?" The public deserves water infrastructure managed by those with lawful authority, technical expertise, and accountability to the communities who built it.

## V. SPECIFIC RELIEF REQUESTED

13

Plaintiffs respectfully request that the Court enter a TRO and/or Preliminary Injunction directing Defendants and all those acting in concert with them to:

1.    Immediately CEASE AND DESIST from conducting any further terminations, layoffs, or adverse employment actions against Corporation employees, pending resolution of this action or further order of the Court;

2.    REINSTATE with full back pay, benefits, and seniority all employees terminated under

    a.  the unauthorized employee handbook not approved by the Board;

    b.  the unauthorized drug testing protocols not approved by the Board; and

    c.  the mass RIF initiated on or after March 13, 2026;

3.    Immediately REINSTATE the Corporation's employee association to its pre-January 2026 status, and REINSTATE AKhi King and all other employees terminated in retaliation for employee association activities, with full back pay, benefits, and seniority;

4.    PROHIBIT any implementation of the proposed increase in Board member compensation to $60,000 per year or any other increase in Board compensation beyond the levels authorized by law and in effect prior to the June 2025 Board reconstitution;

14

5.    PROHIBIT any further expenditures on corporate rebranding, new logos, "Central Alabama Water" branding initiatives, or other non-operational public relations activities;

6.    REQUIRE the Corporation to immediately resume and fully fund the capital investment project administered by Jacobs Engineering related to dam safety and critical infrastructure, and to file with this Court within fourteen (14) days a sworn report confirming the status of all critical capital investment projects and any deferred maintenance items;

7.    ENJOIN the current Board and CEO from implementing any personnel policies, handbooks, or employment rules that have not been formally approved by a vote of the Board of Directors at a properly noticed public meeting, consistent with Section 6.01 of the 1999 Amended Charter;

8.    ENJOIN the current Board from taking any action to further amend the Corporation's Charter, restructure its governance, or alter the appointment authority of the Birmingham City Council, pending resolution of this action;

9.    ENFORCE the Buy-Sell Agreement approved by the City of Birmingham on May 6, 2025, and by the Corporation's Board on May 7, 2025, and ENJOIN the unlawfully constituted Board from taking any further action to impair, rescind, or circumvent that agreement; and

15

10.    PRESERVE the status quo of the Corporation as it existed on June 26, 2025, immediately prior to the Unlawful June 2025 Resolution, to the maximum extent practicable pending resolution of this action.

11.    APPOINT  a type of Receiver as a Director of Workplace Relations charged to monitor and address workplace conduct concerns, including mass employee terminations under questionable pretenses, and other employee abuses or harassment during the pendency of this litigation.

### VI. CONCLUSION

This Court's immediate intervention is required to prevent the ongoing and accelerating irreversible destruction of a public benefit water corporation built and paid for over 75 years by the Birmingham community, whose constitutional rights have been violated by Defendants' unlawful takeover. The threatened harm to 200+ terminated workers, to 600,000 ratepayers, and to the public health infrastructure of the Birmingham metropolitan area is not speculative; it is already occurring. Plaintiffs request that the Court schedule a hearing on the preliminary injunction at the earliest possible date and, in the interim, issue an emergency TRO to maintain the status quo.

Respectfully submitted,

*Calvin B Dunphy*

16

_____

Calvin B. Grigsby, Esq.

2406 Saddleback Drive

Danville CA 94506

(415) 860-6446

cgrigsby@grigsbying.com


Richard Rice, Esq.

The Rice Firm, LLC

115 Richard Arrington Jr. Blvd. N.

Birmingham, AL 35203

205.618.8733 ext 101

rrice@rice-lawfirm.com


Johnathan F. Austin, Esq.

115 Richard Arrington Jr. Blvd N.

Birmingham AL 35203

austin@jaustinlawpc.com

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

17

I hereby certify that on the 21st day of March, 2026, a copy of the foregoing was served on the following by electronically filing same using the CM/ECF system, which will send notification to all parties to the case and served by email to

OFFICE OF THE ATTORNEY GENERAL, STATE OF ALABAMA

501 Washington Avenue, Post Office Box 300152

Montgomery, Alabama 36130-0152

Jim.Davis@AlabamaAG.gov / Scott.Woodard@AlabamaAG.gov

Attorneys for Defendant Governor Kay Ivey

And to the court's chambers.

**/s/Calvin    B.    Grigsby, Esq.**
**Of Counsel**